IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SAUDIA SCOTT, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. GLR-18-1189 |
| OLD NAVY, LLC, et al., | : | |
| | : | |
| Defendants. | | |

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Old Navy, LLC and GAP Inc.'s (collectively, "GAP Defendants") Motion for Summary Judgment (ECF No. 62). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion.

### I. BACKGROUND[1]

On July 25, 2016, Plaintiff Saudia Scott entered the Old Navy clothing store located at 3473 J Merchant Boulevard in Abington, Maryland. (Am. Compl. ¶ 5, ECF No. 39). At that time, Old Navy employees Megan Yost and Chelsea Hunter were working. (Yost Dep. at 27:2–4, ECF No. 62-3).

---

[1] Unless otherwise noted, the facts outlined here are set forth in Plaintiff Saudia Scott's Amended Complaint (ECF No. 39). To the extent the Court discusses facts that Scott does not allege in her Amended Complaint, they are uncontroverted and the Court views them in the light most favorable to Scott. The Court will address additional facts when discussing applicable law.

Scott briefly browsed the women's and junior's sections before proceeding toward the dresses in the front of the store. (Scott Dep. at 34:20–35:3, ECF No. 62-2). Scott asked Yost how much the dresses cost and whether there were any other dresses in stock. (Id. at 35:3–12). Yost replied that there were more dresses in the clearance section located in the rear of the store. (Id. at 35:11–17). Scott took approximately eleven dresses ranging in size from small to extra-large, draped them over her arm, and proceeded to the rear of the store. (Id. at 35:18–22; 43:9). Once there, Scott removed the dresses from her arm, draped them over a cart, and began looking through the clearance section. (Id. at 36:1–4).

As Scott was shopping, Yost observed what she believed to be "a lot of red flags" that Scott was going to shoplift. (Yost Dep. at 26:1–4). Yost thought it was a "red flag" that Scott picked up "the exact same dress, from small, medium, large, extra large" and "barely look[ed] at them" before saying, "I want all of these" and walking to the back of the store. (Id. at 32:1–6). Yost recalled that Scott was "looking up at the ceiling a lot." (Id. at 29:12). Additionally, Yost "felt as though [Scott] was distracting [her]" because Scott was "speaking to [her] a lot" and "saying things that were self-explanatory." (Id. at 29:13–15). Yost said she spoke with Hunter, who "agreed with the red flags." (Id. at 70:5–8). When Yost decided to check on Scott in the back of the store, Scott was "startled" because Yost approached her quietly. (Id. at 70:11–14). At that time, Yost decided to call the police to report that "shoplifting [was] about to occur." (Id. at 47:18–21).

Scott found another dress she wanted and added it to the pile of other dresses, then picked up the pile to walk to the front of the store. (Scott Dep. at 36:4–9). On her way to

the front, Scott picked up another dress and added it to her pile. (Id. at 36:10–15).[2] Scott browsed the store for approximately twenty minutes before getting in line for the cashier. (Am. Compl. ¶ 7). As she approached the register, Scott called her daughter to ask if she had any coupons for Old Navy. (Scott Dep. at 37:3–6). While on the phone with her daughter, Scott asked Yost about signs displayed above the dresses. (Id. at 37:7–20). Yost replied that the sign said shoppers would receive rewards money if they spent more than a certain amount. (Id. at 37:15–18). Scott asked if she could split her purchase into two transactions to receive more rewards money, to which Yost replied that she could. (Id. at 37:21–38:2).

After paying for her items in two separate transactions, Scott exited the store and walked to her car. (Am. Compl. ¶¶ 7–8). Scott noticed two police cars "blocking the exit of the store" as she was leaving the store. (Scott Dep. at 60:19–61:8; Am. Compl. ¶ 9). As Scott approached her car, Harford County Police Officer Brett Smoot started "circling" her car on foot and asked Scott if it was her car. (Scott Dep. at 61:10–14). After Scott replied that it was, Officer Smoot told Scott, "I need you to go back in the store." (Id. at 61:13–17; Am. Compl. ¶ 10). Scott asked Officer Smoot why, to which he responded that the officers "got a call that [Scott] was shoplifting." (Scott Dep. at 61:18–20; Am. Compl. ¶ 10). Officer Smoot then said, "Let's go back in the store." (Scott Dep. at 62:1). Scott returned to the store with Officer Smoot, followed by Harford County Police Officer Daniel Buchler. (Am.

---

[2] Yost reports a slightly different sequence of events, recalling that Scott "darted up to the register as soon as she saw [Yost] on the phone [with police] and bought her items." (Yost Dep. at 45:7–9; see also id. at 43:6–9).

Compl. ¶¶ 10–11). While returning to the store, Officer Smoot asked Scott for her identification, current address, and telephone number. (Scott Dep. at 62:2–8).

Once in the store, Officer Smoot and Scott stood near the check-out line while Officer Buchler walked with Yost to the back of the store. (Id. at 69:1–70:5). Officer Smoot "called [Scott's] information in" on the radio and asked Scott some questions. (Id. at 69:20–70:13; see Am. Compl. ¶¶ 11–12). After about ten or twenty minutes, Officer Buchler came out of the back of the store with Yost and waived to Officer Smoot to "come on" and leave the store. (Scott Dep. at 70:10–71:12). After the officers "escorted" Scott outside, Scott noticed a third police officer sitting at the entryway to the shopping center.[3] (Id. at 72:5–20).

On April 23, 2018, Scott sued GAP Defendants as well as Jane Doe 1 and Does 2–10 ("Jane Doe Defendants"). (ECF No. 1). On October 23, 2018, Scott filed an Amended Complaint dropping Jane Doe Defendants and alleging against GAP Defendants: false imprisonment (Count I); negligence (Count II); negligent hiring/supervision (Count III); negligent training/retention (Count IV); defamation (Count V); intentional infliction of emotional distress (Count VI); and respondeat superior/vicarious liability (Count VII). (Am. Compl. ¶¶ 15–57). Scott seeks compensatory and punitive damages. (Id. at 4–11).

---

[3] Evidence in the record suggests that the third police car was present for reasons unrelated to Yost's 9-11 call about Scott's suspected shoplifting—only Officer Smoot and Officer Buchler appear on the police report, (see Pl.'s Opp'n Ex. 2 ["Police Report"] at 2, ECF No. 89-3), and Officer Smoot testified he was "not a hundred percent positive" whether other officers responded to the call, (Smoot Dep. at 21:18–21, ECF No. 91-2).

GAP Defendants filed a Motion for Summary Judgment on April 8, 2019. (ECF No. 62). Scott filed her Opposition on May 17, 2019. (ECF No. 89). GAP Defendants filed a Reply on May 31, 2019. (ECF No. 94).

## II. DISCUSSION

### A. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation

5

or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Id. Further, if the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

B.  **Analysis**

   1. **Disputed Facts**

Scott argues that summary judgment must be denied because several material issues of fact are in dispute. The Court addresses each factual issue in turn.

   a. **Presence of an "accomplice"**

Scott maintains there is a material dispute about the presence and role of an "accomplice" who purportedly entered the store with Scott. In her deposition, Yost noted the "first red flag" of possible shoplifting was that Scott entered the store at the same time as a man, immediately separated from him, and then the two began talking on the phone at the same time. (Yost Dep. at 28:10–12; see also 36:8–11). Yost assumed Scott was on the phone with the man. (Id. at 28:12–13). At some point, Hunter informed Yost that the man "came behind the registers and grabbed a handful of [Old Navy] shopping bags and ran out the door" while Yost was in the back of the store speaking to Scott. (Id. at 28:15–17; 47:7–10). Yost associated this action with shoplifting because, through her experience and training at Old Navy, Yost believed that shoplifters often "take the dresses and return them to other [Old Navy stores] with the bags that were stolen." (Id. at 38:1–5).

Scott contends Yost's testimony is an "obvious fabrication" because Scott's phone bill shows she was on the phone with a friend when she entered the store and the only call she made while in the store was to her daughter. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. ["Pl.'s Opp'n"] at 8, ECF No. 89-1; see also Pl.'s Opp'n Ex. 3 ["Phone Records"], ECF No. 89-4). Scott points out that GAP Defendants have not presented a surveillance video or other evidence that Scott entered the store with a man. (Pl.'s Opp'n at 14–15). Scott

7

argues that an Old Navy incident report stating that Yost saw Scott get "picked up by the same man who had taken the plastic bag" after the police left is inconsistent with Yost's deposition testimony that she was "pretty sure [Scott] left" before the officers. (Compare Pl.'s Opp'n Ex. 5 ["Incident Report"] at 2, ECF No. 89-6, with Yost Dep. at 94:4–5). Finally, Scott submits that Yost's statement in the incident report is also inconsistent with references in the police report to a "gold" vehicle which had left by the time Yost called the police. (Compare Incident Report at 2, with Pl.'s Opp'n Ex. 2 ["Police Report"] at 2, ECF No. 89-3).

Yost's and Scott's versions of events differ significantly on this point. Nonetheless, the question of whether Scott entered the store with an "accomplice" who took shopping bags from behind the counter is not a material fact because it does not affect the disposition of Scott's false imprisonment claim or any other of her claims.[4] See Anderson, 477 U.S. at 248.

### b. Timing of police call

Scott argues that the assertion in GAP Defendants' Motion that Yost called the police as Scott was leaving the store is inconsistent with Yost's testimony and the police report. Specifically, Yost testified that she called the police once she returned to the front of the store after checking on Scott in the clearance section, (Yost Dep. 29:2–9), and the

---

[4] The Court notes that the presence of an accomplice may be material to determining the applicability of the shopkeeper's privilege, which insulates a merchant from liability for false imprisonment if the merchant "had, at the time of the detention[,] . . . probable cause to believe that the person committed the crime of 'theft,'" Md. Code Ann., Cts. & Jud. Proc. ["CJP"] § 5–402(a) (2018). However, that fact is not material here because the Court finds that Scott was not falsely imprisoned in the first instance.

8

police report shows that Yost placed the call to police at 2:06 PM, (Police Report at 1). However, Scott's receipt is time stamped 2:19 PM, meaning that Yost called the police while Scott was still in the store. (Pl.'s Opp'n Ex. 1 ["Receipts"] at 3, ECF No. 89-2).

As a preliminary matter, any discrepancies between the assertions in GAP Defendants' Motion and the underlying record evidence do not constitute genuine disputes of fact. Rather, the Court's inquiry is whether the record evidence is internally consistent. In this case, Yost's deposition testimony is consistent with the police report, as both tend to show that Yost called the police while Scott was still in the store. Further, even if this fact were in dispute, it would not preclude summary judgment because it is not dispositive to one of Scott's claims. See Anderson, 477 U.S. at 248.

### c. Yost's "red flags"

Scott argues that a genuine dispute of material fact arises from Yost's reliance on "red flags" in her decision to call the police because doing so violated Old Navy's store policies. Scott is incorrect. Yost believed that grabbing the same style dress in different sizes, looking up at the ceiling, and asking excessive questions were "red flags" of shoplifting, which motivated her to call the police. Although Scott offers innocuous explanations for each of these actions, she does not dispute that she exhibited these behaviors. (See Pl.'s Opp'n at 10–12). Thus, the fact that Yost called the police because she observed what she perceived as "red flags," though material to Scott's negligence claim, is uncontroverted.

Separately, Old Navy manager Dana Plauger testified that Yost violated company policy by calling the police while Scott was still present in the store. (See Plauger Dep. at

25:21–26:4; 35:15, ECF No. 91-1). Consistent with this statement, Yost testified that "[i]t's Old Navy protocol to wait until the person left the building" to call the police, but she "wanted to be proactive and preventative" because the police "take a really long time to get there" and she was "uncomfortable" with the situation. (Yost Dep. at 32:13–15; 33:1–5). Further, Yost admitted her decision to call police at that time was "wrong" and inconsistent with store policy, but that she did so anyway because she was "nervous." (See Incident Report at 2). Nowhere in the record does Yost assert that Old Navy policy permitted her to call the police under the circumstances. Once again, Yost's violation of store policy is a material fact, but it is one that is uncontroverted in the record. To the extent Scott argues that Yost's testimony about observing "red flags" is factually inconsistent with the conclusion that Yost violated store policy, she is once again incorrect, as both facts may be true at once. Thus, summary judgment is not precluded.

Scott also argues that Yost's "red flags" are merely "a subterfuge for Yost's [racial] bias and profiling of [Scott]." (Pl.'s Opp'n at 10). Again, Scott's argument misses the mark. Yost has consistently stated that she called the police to report what she believed to be "red flags" that shoplifting was about to occur. Because it is improper to make credibility determinations in considering a summary judgment motion, the Court may not discredit Yost's on-the-record statements. See Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015); Mercantile Peninsula Bank v. French, 499 F.3d 345, 352 (4th Cir. 2007). And in any event, whether Yost's decision to call the police was racially motivated is not material, as it does not affect the Court's disposition of Scott's tort claims against GAP Defendants. See Anderson, 477 U.S. at 248.

### d. Yost's termination

Scott contends there is a genuine dispute of material fact between Yost's testimony that she voluntarily left her position at Old Navy and Plauger's testimony that Yost was terminated. (Compare Yost Dep. at 131:13–15, with Plauger Dep. at 4:7–8). The manner in which Yost's employment ended is not material because, once again, it does not affect the Court's disposition of Scott's tort claims against GAP Defendants. See Anderson, 477 U.S. at 248.

Finding no genuine dispute of material fact, the Court next turns to Scott's claims against GAP Defendants.

### 2. False Imprisonment (Count I)

Under Maryland law,[5] "[f]or a plaintiff to succeed on a false arrest or false imprisonment claim, the plaintiff must establish that the defendant deprived the plaintiff of his or her liberty without consent and without legal justification." State v. Roshchin, 130 A.3d 453, 459 (Md. 2016) (internal quotation marks omitted). GAP Defendants argue that Scott's false imprisonment claim must fail because Scott's movement was not restricted by Yost or the officers.[6] The Court agrees.

---

[5] With respect to tort claims, Maryland applies the principle of lex loci delicti, i.e., the law of the place where the alleged harm occurred. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Ben–Joseph v. Mt. Airy Auto Transporters, LLC, 529 F.Supp.2d 604, 606 (D.Md. 2008); Proctor v. Wash. Metro. Area Transit Auth., 990 A.2d 1048, 1068 (Md. 2010). Because the alleged harm occurred in Maryland, the Court will apply Maryland law with respect to Scott's tort claims. See Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007) (stating that the court "must apply the substantive law of the forum state including its choice of law rules").

[6] GAP Defendants also argue that the shopkeeper's privilege—which insulates a merchant from liability for false imprisonment if the merchant "had, at the time of the

"Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." Estate of Jones v. NMS Health Care of Hyattsville, LLC, 903 F.Supp.2d 323, 331 (D.Md. 2012). In Maryland, false imprisonment requires "some direct restraint of the person." Mason v. Wrightson, 109 A.2d 128, 131 (Md. 1954); see also Henderson v. Claire's Stores, Inc., 607 F.Supp.2d 725, 734 (D.Md. 2009), aff'd sub nom. Henderson v. Claire's Boutiques, Inc., 422 F.App'x 269 (4th Cir. 2011) (finding that shopkeeper's refusal to return credit card and driver's license to shopper could constitute threat of force); Johnson v. United Parcel Servs., Inc., 722 F.Supp. 1282 (D.Md. 1989), aff'd, 927 F.2d 596 (4th Cir. 1991) (holding that employee was not falsely imprisoned where he feared losing his job but was not threatened with force and could have walked out of store without having to pass through a locked door or other physical barrier); Manikhi v. Mass Transit Admin., 758 A.2d 95, 112 (Md. 2000) (finding that locking door, blocking egress, and making unwanted sexual advances constituted an implicit threat of force).

Scott contends she "was not free to go as she pleased" when she returned to the store with Officer Smoot because she was subjected to a "threat of force which intimidate[d]" her. (Pl.'s Opp'n at 20). This assertion is not supported by evidence in the record. Throughout the incident, Scott was only "ten feet [inside] the store" and could have left

---

detention[,] . . . probable cause to believe that the person committed the crime of 'theft,'" CJP § 5–402(a)—applies here. Because the Court finds that Scott's movement was not restricted, the Court need not reach GAP Defendants' claim of shopkeeper's privilege.

12

through the nearby exit. (Scott Dep. at 69:1–6). Yost never touched Scott or threatened her arrest. (Yost Dep. 73:5–7). Nor did the officers touch Scott, tell her she was under arrest, or place her in handcuffs. (Scott Dep. at 73:8–10; 78:10–11; 105:12–14). Officer Smoot never brandished his gun or handcuffs. (Id. at 105:9–14). In fact, Scott testified that Officer Smoot was polite and professional, and nothing about what Officer Smoot said or did intimidated her. (Id. 101:7–10; 101:21–102:11).

Scott's own testimony reveals she was intimidated merely by "being in the company of the police and being questioned about [her] shopping experience." (Id. at 101:19–20). However, the mere presence of the officers is not enough to demonstrate that they exercised "force or threat[s] of force" to deprive Scott of her liberty. See Lipenga v. Kambalame, 219 F.Supp.3d 517, 527 (D.Md. 2016) (holding that plaintiff "fail[ed] to state a claim for false imprisonment" because she did not allege facts demonstrating that defendant used force or threats of force to confine her). And although Scott avers she "knew that if [she] did not return to the store, [she] would be arrested" and that she "was fearful for [her] safety," (Scott Aff. ¶ 8, ECF No. 91-6), there is no evidence that these fears were motivated by Yost's or the officers' conduct. In all, Scott's false imprisonment claim fails because she was not subjected to a threat of force or directly restrained by Yost or the officers.[7] See Mason, 109 A.2d at 13. Accordingly, the Court will grant judgment in favor of GAP Defendants as to Count I.

---

[7] Moreover, Scott asserts in her Opposition that she "readily complied" with Officer Smoot's order to return to the store. (Pl.'s Opp'n at 19). "[V]oluntary consent to confinement nullifies a claim of false imprisonment." Carter v. Aramark Sports & Entm't Servs., Inc., 835 A.2d 262, 285 (Md.Ct.Spec.App. 2003).

### 3. Negligence (Count II)

Scott alleges that GAP Defendants breached a duty to Scott when "Yost called the Harford County Police Department and reported [Scott] was shoplifting," which "caused Harford County Police to restrict [Scott] from leaving without bodily harm or arrest; demand [Scott] to return to the store; search [Scott's] bags; and question [Scott] after [Yost] witnessed [Scott] pay for her purchases." (Am. Compl. ¶ 22). Scott's negligence claim is premised solely on the conduct of Yost—who, notably, is not party to this action—and is merely a recitation of her claim for false imprisonment. Nonetheless, the Court will consider whether Yost was negligent in calling the police to report suspected shoplifting.[8]

The basic elements of a negligence claim are: (1) a duty owed to the plaintiff; (2) a breach of that duty; (3) a causal connection between the breach of duty and the plaintiff's injury; and (4) damages. May v. Giant Food, Inc., 712 A.2d 166, 171 (Md.Ct.Spec.App. 1998). Under Maryland law, negligence is doing something that a person using ordinary care would not do or not doing something that a person using ordinary care would do. Maryland Pattern Jury Instructions 19:1. Ordinary care means the caution, attention, or skill a reasonable person would use under similar circumstances. Id.

At bottom, the evidence in the record shows that Yost's decision to call the police was reasonable under the circumstances. Yost observed what she believed to be "red flags" that Scott was going to shoplift. (Yost Dep. at 26:1–4). Scott picked up several identical

---

[8] Because Officers Smoot and Buchler are not parties to the present action, the Court will not consider whether it was reasonable for them to stop Scott outside the store, ask her to return inside, search her bag, and question her about the incident.

14

dresses in a range of sizes. (Id. at 32:1–6). Yost noticed Scott looking up at the ceiling frequently while she shopped. (Id. at 29:12). Yost believed that Scott was trying to distract her by asking excessive questions. (See id. at 29:13–15). Scott was "startled" when Yost quietly approached her in the rear of the store. (Id. at 70:11–14). Yost's co-worker agreed that Scott's behavior seemed like a red flag. (See id. at 70:5–8). Throughout the incident, Yost felt "uncomfortable" and "wanted to be proactive and preventative." (Id. at 32:13–15; 33:1–5). For these reasons, Yost decided to call the police to report her belief that Scott was about to shoplift.[9] (Id. at 47:18–21).

Scott asserts that Yost's decision to call the police was unwarranted because Scott did not leave the store or attempt to leave the store prior to purchasing her items. This argument misses the mark. Maryland defines theft as "willfully and knowingly; obtaining unauthorized control over the property or services of another; by deception or otherwise; with intent to deprive the owner of his property; by using, concealing, or abandoning it in such a manner that it probably will not be returned to the owner." Lee v. State, 474 A.2d 537, 540–41 (Md.Ct.Spec.App. 1984); see Md. Code Ann., Crim. Law § 7–104(a) (2018). Importantly, a person may demonstrate the requisite intent of theft without leaving the store with the stolen property. See Lee, 474 A.2d at 539 (upholding a conviction of theft where shopper was accused and returned the merchandise before leaving the store). Intent to

---

[9] For her part, Scott offers various explanations for the behavior Yost described as "red flags"; namely, Scott intended to buy several dresses ranging in size so that she could affix her own logo to them and sell them at her private retail business, (Scott Depo. at 27:1–6), and Scott's questions about store promotions were not unusual, (see Pl.'s Opp'n at 12). These explanations are not relevant, however, as the Court must assess whether Yost's actions were reasonable under the circumstances known to her at the time.

15

deprive the owner of property may be inferred from the circumstances, including the shopper's furtive or unusual behavior. Id. at 542–43. The behavior that Yost believed to be "red flags" could also be described as furtive or unusual. Thus, under the circumstances, it was reasonable for Yost to infer that Scott possessed the intent to commit theft.

Finally, Scott directs the Court to evidence that Yost's decision to call the police while Scott was still present in the store was inconsistent with Old Navy policy. As a general matter, a showing that an employee violated a company's internal policies or procedures is not dispositive on the question of liability. See Doe v. Prudential Ins. Co. of Am., 860 F.Supp. 243, 252–53 (D.Md. 1993) ("The Maryland Court of Appeals has 'long held that the custom and practice of a party, as distinguished from general custom and practice, is inadmissible since it is not helpful in a determination of what constitutes reasonable care.'" (quoting W. Md. Ry. Co. v. Griffis, 253 A.2d 889 (Md. 1969))). But more significantly, though Old Navy discourages employees from calling the police while a shopper is still present, the policy actually lends support to Yost's belief that Scott was going to shoplift. Specifically, it explains that "suspicious behaviors" include a person who "distract[s] employees," "[m]oves merchandise around the store," "[p]ays attention to security devices and cameras," and "[q]uickly selects merchandise without paying attention to size, colors, or price." (Pl.'s Opp'n Ex. 12 ["Old Navy Shoplifting Policy"] at 1, ECF No. 90-3). Once again, given these circumstances, Yost's call to police reporting that shoplifting could occur was reasonable.

In sum, the Court finds as a matter of law that Yost's decision to call the police for suspected shoplifting was reasonable under the circumstances such that no reasonable juror

could find that Yost breached her duty to Scott. Accordingly, the Court will enter judgment in favor of GAP Defendants on Scott's negligence claim.

### 4. Defamation (Count V)

GAP Defendants argue that Scott's claim for defamation is barred by the one-year statute of limitations. The Court agrees.

Under Maryland law, defamation claims are subject to a one-year statute of limitations. See Md. Code Ann., Cts. & Jud. Proc. ["CJP"] § 5-105 (2018). Scott filed her initial Complaint on April 23, 2018, more than one year after the date Yost made the alleged defamatory statements. Nonetheless, Scott argues that her claim is timely under the discovery rule, which provides that a cause of action for defamation accrues "when the plaintiff knew, or reasonably should have known, of the wrong." King v. Marriott Int'l, 195 F.Supp.2d 720, 728 (D.Md. 2000) (citing Pennwalt Corp. v. Nasios, 550 A.2d 1155, 1165–66 (Md. 1988)). Scott contends that the discovery rule applies because the defamation claim was filed in response to testimony from Yost's deposition on August 13, 2018. However, there is no evidence in the record suggesting that Scott did not discover or could not have reasonably discovered the facts supporting her defamation claim prior to Yost's deposition. And although Scott notes that the "publication" element of defamation was satisfied by Yost's deposition testimony "that shoppers and Chelsea Hunter were present at the time police brought [Scott] back into the Store and questioned her," (Pl.'s Opp'n at 27), Scott fails to explain why this information could not have been discovered prior to that time. Indeed, Scott herself could have observed that others were present when

17

she returned to the store with the officers. Accordingly, the Court will grant summary judgment in favor of GAP Defendants on Scott's defamation claim.

### 4. Intentional Infliction of Emotional Distress (Count VI)

In order to prove the tort of intentional infliction of emotional distress, a plaintiff must show that: (1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress is severe. Harris v. Jones, 380 A.2d 611, 614 (Md. 1977). GAP Defendants contend that Yost's conduct was not extreme or outrageous.[10] The Court agrees.

Extreme and outrageous conduct is behavior that is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Batson v. Shiflett, 602 A.2d 1191, 1216 (1992) (quoting Harris, 380 A.2d at 614). Absent "truly egregious acts," claims for intentional infliction of emotional distress are rarely upheld. See id. (citing Figueiredo–Torres v. Nickel, 584 A.2d 69 (1991) (psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor); B.N. v. K.K., 538 A.2d 1175 (1988) (physician did not tell nurse with whom he had sexual intercourse that he had herpes); Young v. Hartford Accident & Indemnity, 492 A.2d 1270 (1985) (worker's compensation insurer's "sole purpose" in insisting that claimant submit to

---

[10] GAP Defendants also maintain that Yost's conduct was not reckless and that Scott's emotional distress is not severe. Because the Court finds that Yost's conduct was not extreme or outrageous, the Court need not address the remaining factors.

18

psychiatric examination was to harass her and force her to abandon her claim or to commit suicide)).

Scott points to several of Yost's actions as the basis of her claim for intentional infliction of emotional distress, including Yost's "rude and demeaning manner"; "[sneaking] up on [Scott] by quieting her keys"; calling the police; and later "refus[ing] to cancel the call to police." (Pl.'s Opp'n at 31). Simply put, this conduct does not rise to the level of extreme and outrageous behavior. Yost never touched Scott or threatened her arrest. (Yost Dep. at 73:5–7). There is no evidence that Yost taunted, screamed at, or used profanities toward Scott, let alone acted in a manner beyond all possible bounds of decency. See Batson, 602 A.2d at 1216. As such, the Court will enter judgment in favor of GAP Defendants on Scott's claim for intentional infliction of emotional distress.

### 5. Negligent Hiring/Supervision, Negligent Training/Retention, and Respondeat Superior/Vicarious Liability (Counts III, IV, VII)

Under Maryland law, claims for negligent hiring, supervision, training, or retention and respondeat superior are not standalone claims; rather, they are ways to hold an employer vicariously liable for the alleged torts of its employee. See Stewart v. Bierman, 859 F.Supp.2d 754, 768 n.8 (D.Md. 2012), aff'd sub nom. Lembach v. Bierman, 528 F.App'x 297 (4th Cir. 2013) ("[T]here is no separate cause of action for respondent superior; rather, it is a doctrine that imputes liability for a cause of action to a principal."); Braxton v. Domino's Pizza LLC, No. CIV.A. RDB 06-1191, 2006 WL 3780894, at *6 (D.Md. Dec. 21, 2006) ("[N]egligent supervision and respondeat superior are alternative theories for imposing liability upon an employer for the torts of his employees."); Henley

v. Prince George's Cty., 479 A.2d 1375, 1381 (Md.Ct.Spec.App. 1984) ("An employer may be held responsible for the torts of his employee under three distinct theories: respondeat superior, negligent entrustment, and negligent hiring."), rev'd on other grounds, 503 A.2d 1333 (Md. 1984).

Scott's tort claims against GAP Defendants are premised solely on the conduct of Yost. As discussed above, however, Yost's actions do not constitute false imprisonment, negligence, defamation, or intentional infliction of emotional distress. Because there is no underlying tort by Yost or any other employee of GAP Defendants, the Court may not hold them legally responsible under any theory of vicarious liability.[11] Accordingly, the Court will enter judgment in favor of GAP Defendants on Scott's claims for negligent hiring/supervision, negligent training/retention, and respondeat superior.

### III. CONCLUSION

For the foregoing reasons, the Court will grant GAP Defendants' Motion for Summary Judgment (ECF No. 62). A separate Order follows.

Entered this 31st day of January, 2020.

/s/
George L. Russell, III
United States District Judge

---

[11] Because Scott's vicarious liability arguments fail as a matter of law, the Court need not consider evidence pertaining to Yost's credentials and training.